IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ERIC BLANDING, #170679,           )
                                  )
        Plaintiff,                )
                                  )
    v.                            )    CASE NO. 2:15-CV-007-MHT
                                  )            [WO]
KIM THOMAS, *et al.*,             )
                                  )
        Defendants.               )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on an amended complaint filed by Eric Blanding, an indigent state inmate, challenging actions which occurred during a prior term of incarceration at the Easterling Correctional Facility.  Specifically, Blanding challenges the lack of a grievance procedure in the state prison system, general conditions at Easterling, an attack by another inmate, his access to an attorney visit, the due process provided to him in a disciplinary proceeding, the adequacy of investigations conducted by correctional officials, the failure of classification personnel to grant him a particular custody classification, and alleged violations of administrative regulations. Doc. 25-1 at 5–12.   Blanding names as defendants Kim Thomas, the former Commissioner of the Alabama Department of Corrections; and Derrick Carter, Karla Jones, Sherry Lightner, Stacey Ott, Larry Peavey, Kenneth Drake, Jimmie Wilson, James Deloach, Brian Thompkins and James Griffin, all of whom were correctional officials

employed at Easterling during the relevant period of time.[1]   Blanding seeks monetary damages for the alleged violations of his constitutional rights. Doc. 25-1 at 13.

The defendants filed special reports, supplemental special reports and relevant evidentiary materials in support of these reports—including affidavits, prison documents and medical records—addressing the claims presented by Blanding.  In their reports, the defendants deny acting in violation of Blanding's constitutional rights.

After reviewing the initial special reports filed by the defendants, the court issued an order on October 9, 2015 directing Blanding to file a response to each of the arguments set forth by the defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 53 at 2. The order specifically cautioned that "unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and without further notice to the parties (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary

---

[1] Blanding seeks relief from the defendants in both their individual and official capacities. Doc. 25-1 at 13.  "[W]hen officials sued in [their official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Thus, with respect to Blanding's claims against former commissioner Kim Thomas in his official capacity, current commissioner Jefferson Dunn is the appropriate defendant.  As to the personal or individual capacity claims lodged against defendant Thomas for actions or conditions which occurred during his tenure as Commissioner, Thomas remains a proper defendant. *Walton ex rel. R.W. v. Montgomery Cnty. Bd. of Educ.*, 371 F. Supp. 2d 1318, 1320 n.1 (M.D. Ala. 2005 (finding that a new official may be substituted for official capacity claim but not for individual capacity claim).  The same is true for defendant James DeLoach, who retired from the Alabama Department of Corrections on July 1, 2014. Doc. 51 at 1.

judgment in accordance with the law." Doc. 53 at 2–3.   Blanding filed an unsworn response to this order on March 28, 2016. Doc. 62.   In this response, Blanding merely listed his claims for relief and presented nothing to dispute the arguments or evidentiary materials submitted by the defendants. Doc. 62 at 1–2.   The court likewise provided Blanding an opportunity to file a response to the defendants' supplemental special reports. Doc. 69.   Blanding was advised to do so in compliance with the directives of the October 9, 2015 order. Doc. 69.   Blanding filed no response to the defendants' supplemental special reports.

Pursuant to the directives of the orders entered in this case, the court now treats the defendants' reports collectively as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed. R. Civ. P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial).   The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that the moving party discharges its burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove its case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery*, 64 F.3d at 593-94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact).   In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment.   In respect to the latter, our inferences must

4

accord deference to the views of prison authorities.   Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).   This court will also consider "specific facts" pleaded in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).   "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).   "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does

not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Blanding's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After this review, the court finds that Blanding has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III.  DISCUSSION

### A.    Absolute Immunity

To the extent Blanding lodges claims against the defendants in their official capacities and seeks monetary damages, the defendants are entitled to absolute immunity. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted). Thus, a state official may not be sued in his official

capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst St. School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59.

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x 849 (citing *Pugh*, 438 U.S. at 782).  "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.1990)).  In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment); *Edwards v. Wallace Comm. College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from a state official sued in his official capacity).

## B.    Lack of Grievance Procedure

Blanding complains that the Alabama Department of Corrections does not provide a grievance procedure. Doc. 25-1 at 5.  This claim is without merit because an inmate grievance procedure is "not constitutionally mandated." *Baker v. Rexroad*, 159 F. App'x 61 (11th Cir. 2005); *McCray v. Mallory*, 931 F.2d 54 (4th Cir. 1991) (holding that

Plaintiff's claim challenging sufficiency of inmate grievance procedure "is frivolous" as such procedure is not constitutionally required); *Flowers v. Tate*, 925 F.2d 1463 (6th Cir. 1991) (holding that an inmate "does not have a constitutional right to an effective grievance procedure"); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (holding that there "is no legitimate claim of entitlement to a grievance procedure"); *Miller v. Jones*, 791 F. Supp. 240, 241–42 (E.D. Mo. 1992) (finding that inmate's allegation of "wrongful denial of a grievance [fails to state a viable claim for relief in a § 1983 action because he] has no constitutional right to a grievance procedure"). Thus, the failure of the Alabama Department of Corrections to establish an inmate grievance procedure can provide no basis for relief in this cause of action.

## C.  Failure to Protect—Deliberate Indifference to Safety

Blanding complains that the defendants failed to protect him from attack by inmate George Black in November 2014. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (internal quotation marks and citations omitted). Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards the known risk by failing to take reasonable measures to abate it. *Id.* at 828. A constitutional violation occurs only "when a substantial risk of

8

serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staffs and administrative personnel. . . . They are [also] under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). The Eleventh Circuit has, however, stressed that a "prison custodian is not the guarantor of a prisoner's safety." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990); *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, *Ga.*, 400 F.3d 1313 (11th Cir. 2005) (same). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation [under the Eighth Amendment], there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).

The law is settled that both objective and subjective elements are necessary

components of a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, [providing security for inmates], or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312,

319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834–38, 114 S. Ct. at 1977–80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324–25, 115 L. Ed. 2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).  Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted).  Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id*.

Consequently, to proceed beyond the properly supported motion for summary judgment filed by the defendants, Blanding must first demonstrate an objectively substantial risk of serious harm existed to him from his attacker—inmate George Black— and "that the defendant[s] disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Johnson v. Boyd*, 568 F. App'x 719, 721 (11th Cir.

2014) (citing *Caldwell*, 748 F.3d at 1100).  If he establishes these objective elements, Blanding must then satisfy the subjective component.  To do so, Blanding "must [show] that the defendant[s] subjectively knew that [he] faced a substantial risk of serious harm. The defendant[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. (internal citation omitted).

> To survive a motion for summary judgment, a plaintiff must submit evidence that the defendant-official had subjective knowledge of the risk of serious harm. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). In determining subjective knowledge, a court is to inquire whether the defendant-official was aware of a "particular threat or fear *felt by [the] [p]laintiff*." *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (emphasis added).  Moreover, the defendant-official "must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also draw that inference." *Id*. at 1349 (quotations omitted).

*Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005).

In providing a factual background for his failure to protect claim, Blanding maintains that during his confinement at Holman Correctional Facility in the latter part of 2008 or January 2009 he witnessed inmate Leslie James, a known member of the Crips gang, stab an officer and the officer "then protected himself by using necessary force to subdue James[.]" Doc. 25-1 at 8.  Blanding maintains that he testified on behalf of the officer, which caused friction with inmate "Demont Tucker whom was the head leader of the Crips gang at that time [and] went on to attempt to have Mr. Blanding killed by issuing a gang style hit out on him by other gang members and labeling Blanding a

'snitch.'" Doc. 25-1 at 8.   Blanding alleges that after his transfer to St. Clair Correctional

Facility in 2009 an inmate attacked him, and that he believes the attack occurred because

of the hit placed on him by inmate Tucker. Doc. 25-1 at 8.   Blanding suffered multiple

injuries during this attack, leading to his transfer to Easterling. Doc. 25-1 at 8.

Blanding's narrative continues, in relevant part, as follows:

> Eventually, Blanding and Tucker ended up [together] at Easterling.
> While at Easterling Blanding and Tucker ended up running into each other [on October 9, 2014]. Again, the nonsense started up . . . and Tucker began calling Blanding a snitch in front of everyone and stating your dead. Another hit was put on Blanding and he immediately ran to see classification officers Stacey Ott and Sherry Lightner demanding Protective Custody. He explained everything that was going on with these gangsters . . . Warden Carter was then called into the office and [the allegation regarding his testifying on behalf of an officer at Holman, the validation of inmate Leslie James as his enemy, and the prior attack at St. Clair were] verified on the computer. Cater, Ott and Lightner all still refused Blanding Protective Custody even though he gave up the name of who was ordering these hits. They even refused to lock up Demont Tucker pending an investigation and or transfer Tucker or Blanding to avoid any more violent assaults and or a possible killing.

Doc. 25-1 at 8–9.   Blanding further states that "2 [unidentified] Crips approached [him]

and threatened to stab him if anything happens to Tucker.   So Blanding goes to tell

Officer Wilson but again he is denied permission to go to . . . Protective Custody." Doc.

25-1 at 9.

Blanding contends that his wife and attorneys contacted correctional officials

seeking action based on his requests for protection from inmate Tucker and other

unidentified inmates, but correctional officials ignored their requests. Doc. 25-1 at 9–10.

Blanding, however, contradicts his assertion that officials ignored his requests for

protection when he subsequently states that his attorney "spoke to the defendants attorney and things were eventually worked out to where he would stay in lock up [for his protection] until he transferred [from Easterling]." Doc. 25-1 at 11.

Blanding asserts that "on or about November 19th, 2014 an unidentified inmate (at the time) walked up to Blanding with his face hidden and physically assaulted [Blanding] and cut him 4 or 5 times on his right shoulder." Doc. 25-1 at 10.[2]  Although Blanding alleges his cuts "needed staples" to close the wounds, the body chart prepared by the attending nurse and photographs taken immediately after the alleged assault disprove this assertion and, instead, demonstrate that Blanding suffered only superficial scratches to his upper right arm. Doc. 32-4 at 3–4.

Blanding complains that the defendants acted with deliberate indifference to his safety with respect to the attack perpetrated against him by inmate Black.  In support of this assertion, Blanding argues that the defendants failed to ensure his safety from attack by inmate Black after his requesting protection from inmate Tucker and other unidentified inmates over whom Tucker might have had some influence.  The defendants deny they acted with deliberate indifference to Blanding's safety.

Defendant Carter addresses the failure to protect claim as follows:

On October 9, 2014, inmate Eric Blanding B/170679 reported to Ms. Stacy Ott, Classification Specialist, and Ms. Sherry Lightner, Classification Supervisor, that he feared inmate Damont Tucker, B/189777, due to an incident that happened at Holman Correctional Facility.  Inmate Blanding contends that he talked to an investigator about an altercation between an

---

[2] Blanding later identifies this inmate as George Black.

14

inmate and an officer in 2008 at Holman Correctional Facility. Inmate Blanding states that he talked in favor of the officer. Inmate Leslie James, B/106758, also an inmate at Holman Correctional Facility, found out and began to threaten inmate Blanding. Inmate Blanding and inmate James were validated as enemies on June 27, 2008. Upon assignment at Easterling Correctional Facility, inmate Blanding sees inmate Damont Tucker on the institutional yard and reports to classification staff that inmate Tucker is his enemy because inmate Tucker and inmate James were friends. Inmate Blanding admits that he is affiliated with "Crips" and inmate Tucker admits that he is a "Crip." I interviewed inmate Tucker. Inmate Tucker stated that he knew inmate Blanding, but does not have a problem with inmate Blanding. Inmate Tucker stated that he passed inmate Blanding on the institutional yard and they both spoke to each other. Inmate Tucker stated that he does not have a problem with inmate Blanding. Inmate Tucker submitted a written statement advising that he didn't have any issues with inmate Blanding.

The incident was forwarded to the Enemy Validation Committee for further review. The Enemy Validation Committee found no substantiating facts to validate both inmates as enemies. Both inmates were asked and they both agreed to sign [an] inmate living agreement[] [which they did on October 13, 2014].[3] Both inmates were separated into different dorms.

On November 19, 2014, the shift [commander] conducted an investigation into inmate Blanding being cut [based on Blanding's allegation] he was being threatened by other inmates. The investigation revealed that inmate Blanding cut himself in an attempt to manipulate a transfer from this facility. Inmate Blanding was transferred on January 13, 2015.

Doc. 32-3 at 1–2 (footnote added). It is undisputed that Blanding remained in segregation from November 11, 2014 until his transfer from Easterling on January 13, 2015.

---

[3] The Living Agreement signed by Blanding and Tucker reads as follows:

By our signature below, we acknowledge that we have been counseled by the indicated Officer on this day concerning our disagreements. We, therefore, relieve any and all Department of Corrections Officials of any liabilities and damages. We acknowledge that our problem(s) have been worked out and that we can live at this institution without violence existing between us. We understand that even though we have signed this form, disciplinary action may still be taken against us. This statement is made of our own free will with no treats or promises from anyone.

Doc. 68-1 at 2.

Defendants Ott and Lightner concede they spoke with Blanding on October 9, 2014 regarding his request to have inmate Damont Tucker validated as his enemy because of an incident that happened in 2008 or 2009 at Holman. Docs. 32-1 at 1 & 32-2 at 1.  Ms. Ott summarizes this meeting as follows:

> I reviewed inmate Blanding's file and was unable to find any mention of him and inmate Tucker having problems at Homan C.F.  Inmate Blanding stated that he was involved in an incident at Holman C.F. with an inmate Leslie James, #106758.  Inmate Blanding had taken an officer's side on a situation so inmate James had threatened inmate Blanding.  Inmate Blanding and inmate James are validated as enemies.  Inmate Blanding stated to me and Ms. Lightner that inmate James and inmate Tucker are friends and he was in fear of his life.
>
> Ms. Lightner advised me to call Warden Derrick Carter in order to speak to inmate Blanding about the incident.  Inmate Blanding reported his story to Warden Carter in the presence of myself and Ms. Lightner. Warden Carter also called inmate Tucker to the Administration Building to interview him as well.  Inmate Tucker admitted to knowing inmate Blanding; however, he stated he did not have an issue with inmate Blanding.  Inmate Tucker gave a written statement to this effect.  Warden Carter forwarded all of this information to the enemy validation committee. The enemy validation committee found no substantiating evidence proving that inmate Tucker and inmate Blanding are enemies.  Inmate Blanding and inmate Tucker signed a living agreement.
>
> After an investigation by security personnel, classification as well as myself were made aware of inmate Blanding cutting himself in order to make it appear he was cut by another inmate on November 19, 2014. Inmate Blanding was transferred from Easterling on January 13, 2015.

Doc. 32-1 at 1–2.

In addressing Blanding's failure to protect claim, defendant Thompkins states that:

> On November 19, 2014, Officer Justin Moore radioed me . . . about inmate Eric Blanding, B/170679.  Officer Moore stated that inmate Blanding was bleeding from his arm.  I entered the Health Care Unit and questioned inmate Blanding about his arm.  Inmate Blanding stated that he was going to the Health Care Unit and an inmate with a towel around his face and a

toboggan over his head started hitting him.  Inmate Blanding told me that he did not know that he was bleeding until he got to the Health Care Unit. Sgt. James Griffin and I searched the area where inmate Blanding stated that he was attacked.  I did not see any trace of blood or a weapon. An inmate that was exiting the Health Care Unit, who was assigned to Dorm G-2, told me to question Dorm G-2 inmates about inmate Blanding.  I went to Dorm G-2 and questioned approximately ten inmates.   The inmates stated that inmate Blanding was trying to get transferred and they saw him cut his arm with a razor.   I went back to the Health Care Unit and questioned inmate Blanding again about his arm.  Inmate Blanding stated the Crip gang was trying to extort him for money.  I asked who the inmates were.   Inmate Blanding stated that he did not know.   I asked who approached him.  Inmate Blanding stated . . . the Crip gang, but would not identify any inmate.  I charged inmate Blanding with intentionally creating a security, safety, or health hazard and placed him in the Segregation Unit.

Doc. 32-5 at 1.

Other than his conclusory allegation that the defendants failed to protect him from attack by inmate George Black on November 19, 2014, Blanding presents nothing to establish deliberate indifference by the defendants.  First, Blanding does not allege that he or someone acting on his behalf complained to any prison official before this attack that he was in danger from inmate Black.  Moreover, the record is devoid of evidence that Blanding or anyone else notified the defendants of a previous incident or credible threat as to inmate Black from which the official could infer that Black posed a substantial risk of harm prior to the attack at issue.  Plainly stated, the record contains no evidence that the defendants had knowledge of any impending risk of harm, substantial or otherwise, posed by inmate Black to Blanding.

In sum, there is no evidence before the court of "an objectively substantial serious risk of harm" posed by inmate Black to Blanding prior to the November 19, 2014 attack

as is necessary to establish deliberate indifference. *Marsh*, 268 F.3d at 1028–29.   The general allegations made by Blanding and others regarding potential threats to his safety from other unidentified inmates due to alleged statements made by inmate Damont Tucker did not provide an objective basis on which to find that inmate Black posed a serious risk of harm to Blanding.   Furthermore, even if Blanding had satisfied the objective component, his deliberate indifference claim nevertheless fails as the record contains no evidence that the defendants were subjectively aware of any risk of harm to Blanding posed by Black. *Johnson*, 568 F. App'x at 722 (holding complaint properly dismissed for failure to state a claim because "[n]owhere does the complaint allege, nor can it be plausibly inferred, that the defendants subjectively foresaw or knew of a substantial risk of injury posed by [the inmate-attacker]").

In a case with similar general allegations of potential harm made by an inmate-plaintiff, the Eleventh Circuit concluded that

> the district court did not err by dismissing [Plaintiff's] failure-to-protect charge for failure to state a claim.   While [Plaintiff] alleged he requested protection from certain inmates and that the defendants knew about his request for protection from his original cellmate, prisoner Neisler, he did not allege that the defendants had notice that he was in danger from Thomas, the inmate who attacked him.   Simply put, the allegations of [Plaintiff's] complaint do not show the requisite subjective knowledge of a risk of serious harm, and, thus, do not state a claim for deliberate indifference resulting from a failure to protect from the attack by Thomas. Put another way, because [Plaintiff] alleged no facts indicating that any officer was aware of a substantial risk of serious harm to him from [the inmate who actually attacked him] and failed to take protective measures, his claim fails.

*Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005).   Additionally, the Eleventh

18

Circuit has determined that where a plaintiff provided no evidence that prison officials "had subjective knowledge of the risk of serious harm presented by [the inmate attacker]" and "introduced no evidence indicating that he notified [the defendants] of any particularized threat by [his attacker] nor of any fear [he] felt [from this particular inmate,]" the defendants were entitled to summary judgment on the deliberate indifference claim. *Johnston*, 135 F. App'x at 377; *see McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (holding that district court properly granted summary judgment to the defendants because Plaintiff "failed to show that the defendants had subjective knowledge of a risk of serious harm" when plaintiff merely advised he "had problems" with fellow inmate and was "in fear for [his] life"); *Chatham v. Adcock*, 334 F. App'x 281, 293–94 (11th Cir. 2009) (holding that, where Plaintiff did "not identif[y] any specific serious threat from [fellow inmate]" or report any such threat to the defendants, the mere "fact that [an attacker] was a problem inmate with violent tendencies simply does not satisfy the subjective awareness requirement") (internal quotation marks omitted).  In light of the foregoing, summary judgment is due to be granted in favor of the defendants on Blanding's clam alleging deliberate indifference to his safety.

**D.   General Conditions—Cruel and Unusual Punishment**

Blanding asserts that during his incarceration at Easterling he was subjected to an "unsafe environment" due to overcrowding, understaffing, and a lack of cameras to bolster security. Doc. 25-1 at 6.  Blanding also complains that the facility is "run down [and] torn sheet metal, pipes and other objects of metal [are] clearly visible," which

provide materials for inmates to use in devising weapons. Doc. 25-1 at 7.  He further complains that officers smuggle in contraband, including phones, weapons, drugs, and alcohol, "and nothing is being done to stop it." Doc. 25-1 at 7.

The defendants deny that the conditions made the basis of the instant complaint rise to the level of constitutional violations.   Defendant Karla Jones addresses these claims as follows:

> I have reviewed inmate Eric Blanding's allegation of inmates devising weapons from material found within the facility.   Inmates do make weapons from authorized items.   However, the security staff conducts random security checks and pat searches of inmates and their living areas to detect or discover unauthorized items, weapons and contraband.
> Inmate Blanding also alleges officers smuggle in contraband and nothing is being done to stop it.  All Staff and visitors are pat searched and must clear the metal detector upon entering the facility.  We also conduct vehicle searches to help control the introduction of contraband into the facility.  We strive each day to ensure all staff and inmates are in a safe environment.

Doc. 78-1 at 1–2.   Defendant Jones further concedes that "Easterling Correctional Facility does not have any cameras[,] [but] [a]t least one officer was assigned to the dormitory on the date of the incident." Doc. 76-1 at 2.  Jones also advises that "[t]here may be instances where only one officer is assigned to both sides of the dormitory." Doc. 76-1 at 2.  The defendants do not dispute that at the time relevant to the claims presented by Blanding the number of inmates housed at Easterling exceeded the facility's design capacity and that staffing levels were not at an optimal level.

Although overcrowding and understaffing exists in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court.   Only

actions that deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346.   Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).   Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*.   Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.   Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).   Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32.   For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*,

21

379 F.3d 1278, 1289–90 (11th Cir. 2004).  As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. The court previously identified the applicable standard relevant to establishment of the objective and subjective elements of an Eighth Amendment claim. *See supra* at 10–12.

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes,* 452 U.S. at 347.  "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . .  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347.  To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id*. at 366.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb Cnty.*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme

22

Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991).

As previously noted, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). As the foregoing makes clear, mere negligence "does not justify liability under section 1983[.]" *Id*.

Blanding's general allegations regarding conditions present at Easterling do not establish that the challenged conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298–99; *Rhodes*, 452 U.S. at 347. The conditions referenced by Blanding,

23

though uncomfortable, inconvenient, unpleasant or objectionable, were not so extreme as to violate the Constitution. *See Baird*, 926 F.2d at 1289. Blanding does not allege, much less demonstrate, that he suffered the deprivation of a single individual human need. Furthermore, Blanding fails to demonstrate deliberate indifference or reckless disregard by the defendants with respect to the challenged conditions. Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed. The record is also devoid of any evidence showing that the defendants drew the requisite inference. Consequently, summary judgment is due to be granted in favor of the defendants on the plaintiff's claims attacking the conditions of confinement at Easterling. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *Carter*, 352 F.3d at 1349–50.

### E.    Denial of Attorney Visit

Blanding alleges that after unsuccessful attempts to contact the wardens at Easterling one of his attorneys traveled to the facility to speak with him and with correctional officials regarding his safety at Easterling. Doc. 25-1 at 10. Blanding contends that the officials at Easterling denied him the opportunity to meet with his attorney on this one occasion thereby depriving him of access to this court with respect to the instant civil action and of his right of free speech. Doc. 25-1 at 12. Blanding advises that his attorney subsequently "spoke to the defendants attorney and things were eventually worked out to where he would stay in lock up until he transferred [to another facility]." Doc. 25-1 at 11.

The defendants maintain that "Blanding was approved an Attorney Visit with [members of] the Revill Law Firm on Friday, October 31, 2014." Doc. 75-1 at 1. A November 3, 2014 letter from the Revill Law Firm to Warden Karla Jones and a December 1, 2014 email from the firm to an attorney with the Alabama Department of Corrections make no mention of any denial of a visit with Blanding or of any difficulty in communicating with him. Doc. 6-2 at 1–2.

With respect to Blanding's access to court claim, the law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and defined the right to assistance recognized in *Bounds*. Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349. In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no . . . right [to a law library or to legal assistance]. The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*. . . . [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id*. at 350–51 (citations omitted). The Court further opined that *Bounds* did not require "that the State . . . enable the prisoner to *discover grievances*, and to *litigate effectively* once in

25

court. . . . To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] . . . the Constitution requires." *Id*. at 354.

The Court similarly determined that the mere claim of a systemic defect, without a showing of actual injury, did not present a claim sufficient to confer standing. *Id*. at 349. Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims. *Id*. at 356. "*Bounds* . . . guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts. When any inmate . . . shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury. *Id*. Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement. . . . [I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone." *Id*. at 356–57. "[T]he Constitution does not require that prisoners . . . be able to conduct generalized research, but only that they be able to present their grievances to the courts—a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360. The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided

26

a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts. *Id*. at 356.  A federal district court must "scrupulously respect[] the limits on [its] role, by not . . . thrust[ing] itself into prison administration and instead permitting [p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements." *Id*. at 363 (internal quotation marks and citation omitted).

Blanding presents only a conclusory allegation of a constitutional violation and fails to allege any shortcomings with respect to the legal access provided to him during his confinement at Easterling that adversely affected his efforts to pursue claims before this court.  Although Blanding alleges that he was not allowed to confer in person with his attorney on one occasion to aid in gaining relief sought in the instant action, he has not alleged nor shown that the lack of access to his attorney in any way inhibited his preparation of legal documents, filing of pleadings, or proceeding with this cause of action.  Instead, throughout the proceedings in this case, Blanding has demonstrated that he is proficient at presenting and arguing claims of his choice to this court and has filed all pleadings and documents necessary to the disposition of this case.  Nothing in the record indicates that the alleged lack of access to his attorney on one occasion improperly impeded or adversely affected Blanding's efforts to pursue nonfrivolous legal claims before this or any other court.  Blanding has completely failed to come forward with any evidence that the action about which he complains deprived him of the capability of pursuing his claims in this court.  For this reason, Blanding does not establish that he suffered the requisite injury, *see Lewis*, 518 U.S. at 356, and the defendants are therefore

27

entitled to summary judgment on his legal access claim. *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (holding that an access to courts claim fails where the plaintiff did not show any actual injury); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (holding that an inmate is entitled to no relief on an access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage").

Insofar as the complaint alleges in conclusory terms that the defendants deprived Blanding of his First Amendment right to freedom of speech with respect to the purported lack of an attorney visit, the defendants deny this claim and maintain that they approved a request for a member of the Revill Law Firm to visit with Blanding on October 31, 2014. Doc. 76-1 at 1.   In addition, two pieces of correspondence from the Revill Law Firm compiled during the relevant period of time make no mention of any issue regarding access to Blanding. Doc. 6-1 at 1–2.   And it is undisputed that during the time relevant to the instant complaint Blanding could freely communicate with counsel via both written correspondence delivered by the United States Postal Service and regular or verified telephone calls. *See* http://doc.state.al.us/Adm.Regs., Adm. Regs. 431 § V ¶ K(1), 448 § V ¶ D(1-2) & 434 § V ¶ H(4) & ¶ I(3).

"The First Amendment, as incorporated by the Fourteenth Amendment, prohibits states from abridging the freedom of speech." *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008) (internal quotation marks and citation omitted).   Prison inmates "retain those First Amendment rights of speech 'not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the correctional system.'"

*Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *Al-Amin*, 511 F.3d at 1133 (same).

As previously discussed, the evidentiary materials Blanding submitted do not support his free speech claim. *See* Doc. 6-2 at 1–2.  In addition, at all times during his incarceration at Easterling, Blanding retained the ability to correspond with his attorney through written correspondence and telephone calls.  Under the facts and circumstances of this case, the court finds that no violation of Blanding's constitutional right to free speech occurred and the defendants are therefore entitled to summary judgment on this claim.[4]

**F.     Disciplinary Action**

On November 19, 2014, Defendant Thompkins initiated disciplinary action against Blanding for a violation of Rule 505, which prohibits an inmate from intentionally creating a security, safety, or health hazard. Doc. 32-4 at 9.  Defendant Thompkins charged that on this date an investigation revealed Blanding "intentionally cut [his] upper arm in an attempt to be removed from general population." Doc. 32-4 at 9.  Officer Darrel Gettis served Blanding with notice of the disciplinary charge and the scheduled date for the disciplinary hearing related to this charge. Doc. 32-4 at 9.  Blanding refused to sign the document acknowledging receipt of service of the disciplinary and likewise did not identify any witnesses to be called at the disciplinary hearing. Doc. 32-4 at 9.

---

[4] Although Blanding also makes a cursory reference to the Sixth Amendment, Doc. 25-1 at 12, the right protected therein is only applicable to representation provided in criminal cases and is not implicated where, as here, the potential representation by counsel relates to civil proceedings.

During the disciplinary hearing, the hearing officer, Sergeant Stephanie Jetton, provided Blanding the opportunity to question Defendant Thompkins, present evidence on his own behalf, and provide testimony. Doc. 34-2 at 9–12.  In response, Blanding provided a statement of facts denying the charge.  Defendant Thompkins, however, testified that after investigating the area where Blanding alleged the assault occurred and finding no evidence to support this claim, he proceeded to Blanding's dorm to conduct a further investigation. Doc. 32-4 at 9.  At this time, "[a]ll of the inmates questioned stated that [Blanding] had cut his own arm before he left the dorm to get moved out of population." Doc. 32-4 at 9.  Defendant Thompkins also testified that these confidential sources had on several occasions in the past provided reliable information and the information provided by the sources was corroborated by his investigation of the area of the alleged attack and the superficial injuries to Blanding's right arm. Doc. 32-4 at 14 & 18.  A photograph of Blanding's arm taken on the date of the incident supports the testimony of Defendant Thompkins as it depicts only superficial scratches to the upper area of the inmate's right arm. Doc. 32-4 at 10.  The nurse who treated Blanding also noted he suffered only "superficial" cuts to his arm. Doc. 32-4 at 3.

Upon completion of the noticed disciplinary hearing and after considering all of the testimony, Sgt. Jetton adjudged Blanding guilty of the charged offense. Doc. 32-4 at 17.  Jetton made findings of fact that, on November 19, 2014, "Inmate Blanding did intentionally cut his own arm in Dorm G2 in an attempt to be removed from general population." Doc. 32-4 at 17.  Defendant Jetton advised that she based her findings of

fact on the sworn testimony of the arresting officer and other evidence submitted at the hearing. Doc. 32-4 at 17.   The sanctions imposed upon Blanding for this disciplinary infraction consisted of the loss of outside, canteen, telephone, and visitation privileges for 30 days. Doc. 32-4 at 10.   The record also indicates that correctional officials placed Blanding in administrative segregation upon his commission of this offense. Doc. 32-4 at 2.  Based on his requests for protection, Blanding remained in administrative segregation until his transfer from Easterling on January 13, 2015. Doc. 32-3 at 2.

Blanding contends that the disciplinary action violated his rights to due process and also appears to allege that the arresting officer based the charge on false information.

### 1.    *False Information*

With respect to Blanding's challenge to the veracity of the information underlying the disciplinary charge, Defendant Thompkins maintains that the information he obtained from several inmates that Blanding cut himself was true and correct. Doc. 32-4 at 14 & 18.   In *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991), the Court held that reliance on admittedly false information to deny a prisoner consideration for parole was arbitrary and capricious treatment violative of the Constitution.   The appellate court, however, carefully distinguished its holding in *Monroe* from its prior decision in *Slocum v. Georgia State Board of Pardons and Paroles*, 678 F.2d 940 (11th Cir.), *cert. denied*, 459 U.S. 1043 (1982):

> Our holding today does not conflict with our earlier holding in *Slocum*, *supra*.   In *Slocum*, the plaintiff, who had been denied parole, made the conclusory allegation that the Board must have relied upon erroneous

information because otherwise the Board would surely have granted him parole. *Slocum*, 678 F.2d at 941. The plaintiff then sought to assert a due process right to examine his prison file for the alleged errors. Unlike the instant case, in *Slocum* the state did not admit that it had relied upon false information in denying parole nor did the plaintiff present any evidence that his prison file even contained any false information. We held in *Slocum* that prisoners do not state a due process claim by merely asserting that erroneous information may have been used during their parole consideration. *Id.* at 942. We also determined that prisoners do not have a due process right to examine their prison files as part of a general fishing expedition in search of false information that could possibly exist in their files. *Id.* In the case at bar, we are confronted with prison authorities who admit that information contained in Monroe's files is false and that they relied upon such information, at least in part, to deny Monroe parole and to classify him as a sex offender. As we stated, the parole statute does not authorize state officials to rely on knowingly false information in their determinations.

*Monroe*, 932 F.3d at 1442 (citing *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982)). *Slocum* controls the disposition of the instant false information claim.

The record demonstrates that the defendants involved in the disciplinary action believed that the information regarding Blanding's act of self-harm was true. Thus, their reliance on this information did not infringe on any of Blanding's constitutional rights. Of specific importance, there is no admission by the defendants that the information used during the disciplinary proceedings was false, fabricated, incorrect, or erroneous. The record is devoid of evidence that the defendants knowingly relied on false information in disciplining Blanding. Moreover, Blanding's conclusory allegation regarding the use of false information does nothing more than raise the possibility that information in his records may be false and this mere possibility fails to provide a basis for relief. *Monroe*,

932 F.2d at 1142; *Jones v. Ray*, 279 F.3d 944 (11th Cir. 2001) ("[P]risoners cannot make a conclusory allegation regarding the use of [false] information as the basis of a due process claim.").

The record in this case demonstrates that the defendants did not rely on admittedly false or fabricated information in the disciplinary proceedings. Consequently, Blanding is entitled to no relief as a matter of law and entry of summary judgment in favor of the defendants on this claim is appropriate.

### 2.   *Due Process*

The Supreme Court has identified two circumstances in which a prisoner—an individual already deprived of his liberty in the ordinary sense—can be further deprived of his liberty such that due process is required:

> The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S. Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 492–93, 100 S. Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital). The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S. Ct. at 2300; *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process); *cf. Dudley v. Stewart,* 724 F.2d 1493, 1497-98 (11th Cir. 1984) (explaining how the state creates liberty interests). In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

*Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).

Due to the loss of outside privileges imposed as a result of the challenged disciplinary, the second situation is present in this case. *Id*.  Pursuant to applicable administrative regulations contained on the database maintained by the Alabama Department of Corrections, http://doc.state.al.us/Adm.Regs., an inmate in segregation is "afforded the opportunity to exercise outside of [his] cell[] for at least five (5) hours per week during a seven (7) day period, weather permitting." Adm. Reg. No. 434 § V, ¶ (H)(8)(a).  Thus, Alabama prisoners housed in segregation "have a state-created interest in yard time. . . . Furthermore, deprivation of yard time imposes enough of a hardship to qualify as a constitutionally protected interest." *Bass*, 170 F.3d at 1318.  In addition, the value of outside time to inmates in segregation "is substantial" and loss of this time "is therefore atypical and significant" to these inmates. *Id*.

In the context of a prison disciplinary proceeding where a protected liberty interest is implicated, the Due Process Clause requires the provision of three procedural protections which are (1) advance, written notice of the charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action taken. *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974).

> The Supreme Court later clarified that "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits.  This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced. . . .'"  "Ascertaining whether this standard is satisfied does not

require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." "The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." In *Hill*, the Supreme Court upheld the determination of a disciplinary board even though the evidence "might be characterized as meager" because the record was not so devoid of evidence as to render the board's decision arbitrary.

*Tedesco v. Sec'y for Dep't of Corr.*, 190 F. App'x 752, 757 (11th Cir. 2006) (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455–57 (1985)). It is not, however, the function of this court to assume the task of retrying prison disciplinary disputes and no *de novo* review of a hearing officer's factual findings is required when the decision is supported by some evidence. *Smith v. Rabalais*, 659 F.2d 539, 545 (5th Cir.), *cert. denied*, 455 U.S. 992 (1982). This court must only determine "whether there is any evidence in the record that could support the conclusion reached by the disciplinary [hearing officer]." *Hill*, 472 U.S. at 455–56. In addition, where a hearing officer's decision is based upon hearsay information derived from an unidentified confidential informant, due process is satisfied "where the witness relaying information provided by a confidential informant testifies [at the disciplinary hearing] that he knows the informer, that he used him in the past, and that the informer had first hand knowledge of the incident reported." *Kyle v. Hanberry*, 677 F.2d 1386, 1390 (11th Cir. 1982). However, where the hearing officer has "a sufficient evidentiary basis independent of the information obtained from confidential informants, then procedural due process concerns

would be allayed." *Williams v. Fountain*, 77 F.3d 372, 375 (11th Cir. 1996) (citing *Kyle*, 677 F.2d at 1391).

A thorough review of the disciplinary report demonstrates that the disciplinary proceedings comported with the requirements of *Wolff* and *Kyle*. Correctional officials furnished Blanding with advance, written notice of the charge against him; allowed him the opportunity to call witnesses, question the arresting officer, and present evidence; and provided written statements by the factfinder describing the evidence on which she relied and the reasons for the disciplinary action. The record of the disciplinary hearing also demonstrates that the arresting officer provided testimony regarding the reliability of his confidential source and supplied testimony of evidence of corroboration of the information received form confidential sources—the superficial nature of the cuts to Blanding's right arm. Doc. 32-4 at 9, 12 & 14. The testimony of the arresting officer therefore constituted some evidence to support the decision of the hearing officer. Nothing more is required by the Constitution. Blanding received all the process to which he was due in the disciplinary proceeding.

G.   **Adequacy of Investigations**

Blanding asserts that the defendants did not adequately investigate numerous complaints he made regarding his safety. The alleged lack of adequate investigations, standing alone, fails to state a claim cognizable in this cause of action.

"It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Oklahoma*

*City v. Tuttle,* 471 U.S. 808, 816 (1985). "The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 196 (1989). "The law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014); *Wilkins v. Illinois Dept. of Corrs.*, 2009 WL 1904414, *9 (S.D. Ill. 2009) (recognizing that inmates have no due process right to an investigation); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (finding that prisoners do not have a due process right to an investigation of grievances). For these reasons, the court concludes that the purported failure to conduct adequate investigations does not rise to the level of a constitutional violation and, therefore, provides Blanding no basis for relief.

## H.   Classification

To the extent the complaint can be construed to challenge the due process provided by classification personnel in denying Blanding placement in a particular custody level, Blanding is entitled to no relief. Consistent with Eleventh Circuit jurisprudence,

> there are only two instances when a prisoner may be deprived of a due process liberty interest under § 1983:
>
>> "The first is when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy,

> and the deprivation of that benefit imposes atypical and
> significant hardship on the inmate in relation to the ordinary
> incidents of prison life."

*Morales v. Chertoff*, 212 F. App'x 888, 890 (11th Cir. 2006) (quoting *Kirby v. Siegelman*,

195 F.3d 1285, 1290–91 (11th Cir. 1999)).  Blanding's claim fails to implicate either of

the *Kirby* situations because his assigned custody level while at Easterling was not so

severe that it exceeded the sentence imposed by the court nor did the administrative

regulations governing custody levels bestow a benefit to him the deprivation of which

imposed an atypical and significant hardship. *See Kirby*, 195 F.3d at 1290–91; *Slezak v.*

*Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) (holding that the Constitution affords no liberty

interest in a prisoner's custody classification); *cf. Meachum v. Fano*, 427 U.S. 215, 224–

26 (1976) (holding that a prisoner does not have a liberty interest in assignment to any

particular prison, regardless of whether the conditions of one prison are decidedly more

disagreeable than another).

## I.    Administrative Regulations

In his complaint, Blanding makes vague references to alleged violations of

administrative regulations by the defendants.  Infringements of agency rules, regulations

or procedures do not, without more, amount to constitutional violations. *Sandin*, 515 U.S.

at 484–86; *Magluta v. Samples,* 375 F.3d 1269, 1279 n.7 (11th Cir. 2004) (noting that the

mere fact a governmental agency's regulations or procedures may have been violated

does not, standing alone, raise a constitutional issue); *Myers v. Klevenhagen*, 97 F.3d 91,

94 (5th Cir. 1996) (holding that claim alleging prison officials have not followed their

own policies and procedures does not, without more, amount to a constitutional violation); *United States v. Caceres,* 440 U.S. 741, 751–52 (1979) (holding that mere violations of agency regulations do not raise constitutional questions).  As a result, the defendants are entitled to summary judgment on Blanding's claim alleging a violation of internal administrative regulations.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **February 12, 2018**, the parties may file objections to this Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made.

Frivolous, conclusive, or general objections to the Recommendation will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.

11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

     DONE this 29th day of January, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE